UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM BUMPUS,

        Plaintiff,

        v.

AIRLINE PILOTS ASSOCIATION,
INTERNATIONAL and UNITED AIRLINES,
INC.,

        Defendants.

No. 21 CV 5557

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff William Bumpus was an employee of United Airlines beginning in 2000. He alleges that United and his union, the Airline Pilots Association, International, miscalculated his window to be recalled to work after a furlough and told him that the window closed much earlier than it actually did. After filing a grievance about his recall rights, he went through two stages of pre-arbitration adjudication, as mandated by the collective-bargaining agreement. He now seeks to compel arbitration in front of the System Adjustment Board, pursuant to Section 204 of the Railway Labor Act. United and the union say he cannot do that without the approval of the union, which has refused to proceed to arbitration on his behalf. They also say that he must at least exhaust all the pre-arbitration stages before compelling arbitration. And because plaintiff has yet to present his grievance to the third and final pre-arbitration adjudicative body, he has not exhausted the preconditions to filing this suit.

There are two questions here: whether the Railway Labor Act gives individual employees the right to compel arbitration and, if so, whether Bumpus exhausted his grievances before compelling arbitration. For the reasons below, I deny plaintiff's motion for summary judgment, [18], and grant defendants' cross-motion for summary judgment, [20], and motion to supplement, [29].

## I.    Legal Standard and Jurisdiction

Summary judgment is proper when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in favor of the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). But the moving party is entitled to summary judgment when the nonmoving party fails to make "a sufficient showing on an essential element" of his case for which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). These standards apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I consider evidence from both motions to ensure that there is no material dispute. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Under the Railway Labor Act, "[a] dispute about the interpretation or administration of a collective-bargaining agreement must be resolved by an adjustment board." *Miller v. Sw. Airlines Co.*, 926 F.3d 898, 903 (7th Cir. 2019); *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252–53 (1994). While I have jurisdiction to interpret the Act itself, I lack jurisdiction to interpret

2

collective-bargaining agreements made under the Act. *Ryan v. Union Pac. R.R. Co.*, 286 F.3d 456, 460 (7th Cir. 2002).

## II. Facts

United first hired Bumpus as a pilot on June 11, 2000. [23] ¶ 13.[1] He went on military leave in 2001 and was furloughed on March 2, 2002. [23] ¶¶ 15–16. Under the then-existing collective-bargaining agreement, plaintiff had a maximum potential recall window ending March 2, 2009. [23] ¶ 17. In 2013, though, United offered Bumpus a "final" recall with recall rights extending until the end of 2015. [23] ¶ 20.[2] The recall package Bumpus received included a copy of a pending furlough mitigation agreement that would extend the new recall window to ten years from the date of furlough. [23] ¶ 21.[3] As a result, Bumpus asked United about his employment status.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are largely taken from defendants' response to plaintiff's Local Rule 56.1 statement of material facts, [23], plaintiff's response to defendants' statement of additional material facts, [27], and plaintiff's response to defendants' statement of material facts in support of their cross-motion for summary judgment, [26], where both the asserted fact and the opposing party's response are set forth in one document. Where material facts are disputed, and the cited exhibits do not directly contradict the non-movant's version of the facts, I include the facts in the light favorable to the non-movant.

[2] Defendants dispute this fact, saying that "[a]ny such offer would have been in conflict with" the collective-bargaining agreement. [23] ¶ 20. In support, they cite to a declaration from the manager of the union's Representation Department. [22-2]. According to the manager, the collective-bargaining agreement in effect at the time allowed for no more than seven years on furlough status, and possibly less if United needed additional pilots before the seven-year period expired. [22-2] ¶ 7. This fact is not responsive to plaintiff's statement; it could be true that, despite the provisions of the collective-bargaining agreement, Bumpus (and potentially others) were offered extended recall rights, perhaps in error.

[3] Defendants dispute this. [23] ¶ 21. But the cited evidence ([22-2] ¶ 7) does not dispute that United sent such a package; it only says that the then-collective-bargaining agreement offered a maximum seven-year recall window and plaintiff did not submit paperwork that would have allowed him to return later.

[23] ¶ 22.[4] In response, in November 2015, United's furlough return coordinator emailed Bumpus to tell him that his furlough recall window extended until March 2, 2019. [23] ¶ 23.

In January 2019, Bumpus told United and the union that he was in the process of obtaining a Federal Aviation Administration review of his medical flight status and requested an extension of his March 2, 2019, recall date. [23] ¶ 24. Both United and the union told Bumpus that, in fact, his recall rights had already expired. [23] ¶ 25. In February 2019, the union provided more specifics; it told plaintiff that his recall rights expired in 2007 after a mandatory recall. [23] ¶ 26. Amidst confusion about plaintiff's employment history and status, the union got United to toll the clock on plaintiff's recall rights, in the event that they hadn't expired. [23] ¶ 27. The union told plaintiff that, despite the tolling agreement, "there ha[d] been no determination at this point that [plaintiff] ha[d] a right to return to United." [23] ¶¶ 27–28. In early February 2019, United told Bumpus that his recall and seniority rights had expired in March 2012. [23] ¶ 29.

Bumpus continued to pursue FAA certifications. He obtained authorization for special issuance of a medical certificate on February 27, 2020, and a first-class airman

---

[4] Defendants object to many of the assertions in plaintiff's statement of material facts as immaterial. [21] at 17 (objecting to [23] ¶¶ 17–23, 25–26, 29–33, 35, 38–39, 42). I agree with most of those objections, *see* [23] ¶¶ 17–22, 25–26, 29–30, 35, and do not consider those facts in my legal analysis. However, I include some of them here to provide greater context to the dispute. Where immaterial facts are also disputed, I read the facts in the light most favorable to the non-movant.

4

medical certification on June 15, 2020. [23] ¶¶ 32–33.[5] In August 2020, having obtained the necessary certifications to fly, Bumpus emailed a United official. [23] ¶ 34. He told her he was aware of at least two other pilots who were hired in 2000 and furloughed in 2002 (like him) and who returned to United in the past year with seniority rights intact. [23] ¶ 34 (citing [22-17] at 2). He said, "There is a precedent for others with my same hire and furlough years to return to United with seniority." [23] ¶ 34 (citing [22-17] at 2). In November 2020, Bumpus discovered union statements from 2019 about 2009 furloughees. [23] ¶ 36.[6] Bumpus says these communications "encouraged 2009 furloughees to exercise their recall rights," [23] ¶ 36, but defendants rightly note that the October 2019 publication only informed furloughees that they were hitting their ten-year recall limit and, if they wanted to return, had to inform United within a certain time period before their recall expiration. [22-20] at 5. Meanwhile, the January 2019 email said only that United welcomed seventy furlough returns in 2018. [22-19] at 2. The first statement was published on the union's website in 2019, and the second was emailed to Bumpus in 2019. [23] ¶ 36 (citing [22-5] ¶¶ 4–6).

---

[5] Authorization for special issuance of a medical certificate allows an airman to work for a specified period of time, despite not having met the FAA's established medical standards. 14 C.F.R. § 67.401(a). Airmen exercising pilot-in-command privileges must hold a first-class medical certificate, 14 C.F.R. § 61.23(a)(1)(i), whose criteria are laid out in 14 C.F.R. § 67.101–15.

[6] Defendants dispute this. They say that the statements were published on the union's website in 2019 and one of the communications was emailed to plaintiff in January 2019. [23] ¶ 36. But both these things can be true: even though the statements were published in 2019, plaintiff only discovered them (including one in his email) in 2020. Whether Bumpus reasonably should have known of the statements before 2020 is a different issue.

On March 2, 2021, Bumpus filed a written grievance asserting his recall rights. [23] ¶ 40. The grievance requested that the arbitration board be staffed by a single arbitrator unassociated with the union or United "to ensure that the final decision is rendered in a fair and unbiased manner." [23] ¶ 40. In April 2021, pursuant to the terms of the collective-bargaining agreement, [18-4] at 187, a Level 1 grievance hearing was held. [23] ¶ 43. Later that month, the Denver chief pilot, who had presided over the Level 1 grievance hearing, issued a decision. [23] ¶ 45. Among other things, he found that plaintiff's grievance was untimely filed. [18-6] at 3. Under the collective-bargaining agreement, employees have 180 days from the date they "reasonably would have had knowledge of the facts upon which the grievance is based" to file their grievance. [26] ¶ 5 (citing [18-4] at 187). The Denver chief pilot said plaintiff waited until thirteen months after the grievance expiration date to submit his grievance. [18-6] at 3.

Plaintiff timely appealed the denial. [23] ¶ 46. On May 18, 2021, three days before plaintiff's Level 2 hearing, the union's senior labor relations counsel emailed plaintiff's attorney and said that plaintiff's grievance was "contractually baseless and untimely," and that supporting plaintiff's grievance would be "inconsistent" with the union's duty to "represent all pilots." [23] ¶ 47. The union's lawyer also said that the union would be "presenting this information to United" during the upcoming hearing. [23] ¶ 47. A month after the Level 2 hearing, the United employee who'd presided over the hearing issued a written decision denying plaintiff's grievance for, among other things, untimeliness. [23] ¶ 49. The decision said that if plaintiff was

dissatisfied with the outcome, he had the right under the collective-bargaining agreement to appeal to the board of adjustment. [23] ¶ 49.

In July 2021, plaintiff filed with the union a submission to the board of adjustment, seeking to represent himself through his attorney and at his own expense. [23] ¶ 50. Around two weeks later, Joseph Pedata, chairman of the union's Master Executive Council (MEC) Grievance Committee, told plaintiff's lawyer that only the union, and not an individual grievant, had the right to appeal to the board of adjustment. [23] ¶ 51. The union relied on Section 18-C-2 of the collective-bargaining agreement. [18-10] at 2. That section requires the board of adjustment to "consider any dispute properly submitted to it" by the union or airline. [18-4] at 196. The collective-bargaining agreement does not say that individual employees can submit a dispute to the board. [18-4] at 196. Over the next week, Pedata and plaintiff's attorney exchanged emails asserting their positions. [23] ¶¶ 52–53. (Plaintiff's attorney also told the union to "desist from any effort to interfere with or frustrate" plaintiff's "right of appeal." [23] ¶ 52.) On August 13, 2021, Pedata told plaintiff that the Master Executive Council had decided not to submit plaintiff's grievance to the adjustment board, but that plaintiff had the right to appeal that denial, internally, to the Executive Council's Grievance Review Panel. [23] ¶ 54. A week later, plaintiff made a written request for a hearing before the panel. [23] ¶ 55. In emails between late September and mid-October, plaintiff, his lawyer, Pedata, and other union representatives argued about how soon the Grievance Review Panel would convene. *See* [23] ¶ 56; [26] ¶¶ 49–50; [18-15]; [22-22]. Plaintiff

told Pedata that, based on a recent Second Circuit decision, he believed he had only six months from accrual of his claim to compel arbitration. [18-15] at 2 (citing *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568 (2d Cir. 2019)). In light of that decision, plaintiff said, he needed a panel hearing no later than November 10, 2021. [18-15] at 2, 4. Pedata told Bumpus that the union didn't understand his statute-of-limitations argument because the panel hadn't heard or issued a decision on the appeal (implying that he believed plaintiff's claim wouldn't accrue until the panel issued a decision). [18-15] at 3. But Pedata said that if plaintiff was genuinely concerned about the statute of limitations, the union would agree to toll the clock (assuming it had already started running) until the panel issued its decision. [18-15] at 3. Finally, Pedata said the panel would likely meet in late winter or early spring of 2022. [18-15] at 3.

At a certain point in the exchanges, Bumpus's attorney took over for him and the union's lawyer took over for Pedata. The union lawyer picked up on Pedata's accrual point and said that the six-month statute of limitations on Bumpus's claim wouldn't begin to run unless and until the Grievance Review Panel decided against Bumpus. [22-22] at 3. The lawyer also said that if Bumpus filed his suit before a decision from the Grievance Review Panel, he would be subject to dismissal on ripeness and exhaustion grounds. [22-22] at 3. Finally, the lawyer reiterated that the union would toll any applicable statute of limitations on plaintiff's claim to compel arbitration, and said United had agreed to tolling, too. [22-22] at 3. In response, plaintiff's lawyer said that although a favorable decision by the review panel could

moot the case, "in view of the dilatory and disrespectful treatment of Mr. Bumpus to date, we cannot justify further delay based on that forlorn hope." [22-22] at 2. He told the union lawyer that, in fact, his email had arrived just minutes before a complaint was filed in federal court on plaintiff's behalf—this case. [22-22] at 2.

The complaint seeks an injunction ordering the defendants to arbitrate the dispute over Bumpus's grievance before a board of adjustment and invokes Section 204 of the Railway Labor Act, 45 U.S.C. § 184. [1] at 1, 14. After plaintiff filed suit, the parties agreed to go directly to cross-motions for summary judgment. [17]. Bumpus moved for summary judgment, arguing that employees have an individual right to compel arbitration and that it was the role of the adjustment board, and not the court, to decide whether plaintiff timely filed his grievance. [18], [18-1]. Defendants cross-moved for summary judgment, arguing that plaintiff's claim wasn't ripe, he hadn't exhausted the grievance process, and only the union or employer can compel arbitration. [20], [21].

In mid-February 2022, after this case was filed, defendants moved to supplement the record. [29]. They said that on November 18, 2021, the union notified plaintiff that his Grievance Review Panel hearing would be held on March 2, 2022, and requested that plaintiff confirm his participation. [29] ¶ 2. Plaintiff didn't respond, so the union sent another email in January 2022, telling him that if he didn't respond by later in the month, his hearing would be cancelled. [29] ¶ 3. Neither plaintiff nor his counsel responded. [29] ¶ 4. Plaintiff opposes defendants' motion to supplement the record. [30]. Defendants say plaintiff's unwillingness to attend his

scheduled Grievance Review Panel hearing "further demonstrate[s]" that plaintiff hasn't exhausted his remedies. [29] ¶ 5.

Plaintiff counters that exhaustion of remedies only applies to grievants who seek to have a federal court address the *merits* of their grievance. [31] at 3. The implication is that any new information related to exhaustion is irrelevant. He also says that the union's "cynical proffer" of a hearing date seven-and-a-half months after United's refusal to arbitrate was an "invitation to a starkly futile process," given that, in his view, the statute of limitations to compel arbitration would have already expired by the hearing. [31] at 3. These are the same arguments plaintiff made in his motion for summary judgment. [18-1]. Because I hold that plaintiff is required to exhaust the grievance process, new information that shows he did not participate in the scheduled hearing is relevant, and defendants' motion to supplement the record is granted.

## III.  Analysis

### A.    Ripeness

Defendants say I lack subject-matter jurisdiction over this suit because plaintiff's claims aren't ripe. [21] at 19–21. Ripeness is based on the Constitution's case-or-controversy requirement and discretionary prudential considerations. U.S. Const., Art. III, § 2; *Wis. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). The doctrine seeks to prevent the courts from wading into abstract disagreements. *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967)). The dispute must be "definite and concrete" and "of sufficient immediacy and reality" to warrant

judgment from the court. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Whether a claim is ripe depends on two factors: "the hardship to the parties of withholding court consideration" and "fitness of the issues for judicial decision." *Wis. Right to Life*, 664 F.3d at 148 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)).

Plaintiff has suffered concrete hardship: he hasn't been able to work for United at his previous seniority level because, he says, defendants incorrectly calculated when his recall rights expired. [23] ¶ 29. As to the second factor, "[c]laims that present purely legal issues [like the main claim here] are normally fit for judicial decision." *Wis. Right to Life*, 664 F.3d at 148. Whether plaintiff has an individual right to compel arbitration doesn't depend on future occurrences. He either does or he doesn't, regardless of the specific set of facts. Plaintiff's claim is ripe, and I have jurisdiction.

## B.    The Employee's Individual Right to Compel Arbitration

One threshold issue is whether an individual employee has the right to compel arbitration before an adjustment board, or whether that right is exclusive to the union and employer. If the latter, then regardless of whether plaintiff has exhausted the pre-arbitration process, he cannot compel arbitration himself.

### 1.    *Text*

The Railway Labor Act provides, in relevant part, 45 U.S.C. § 184 (emphases added):

> The disputes between *an employee or group of employees and a carrier or carriers* by air growing out of grievances…shall be handled in the *usual manner* up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner,

the disputes may be referred by *petition of the parties or by either party* to an appropriate adjustment board.

The most logical reading of the statute is that "the parties" refers to the entities mentioned earlier in the sentence: "an employee or group of employees and a carrier or carriers." 45 U.S.C. § 184. But defendants say this isn't the case. They say "the parties" instead refers to the parties to the collective-bargaining agreement—the union and the employer. [21] at 34. Because individuals are not parties to the agreement, they cannot refer a grievance to the adjustment board, so the argument goes. [21] at 34. As defendants see it, if Congress intended to give individual employees the right to seek arbitration, it would have used the word "employees" instead of "parties." [21] at 34. But a similar argument could be made about defendants' reading: if Congress did not intend to give individual employees the right to seek arbitration, while referring to a dispute of an employee, it could have said "parties to the collective-bargaining agreement." What's more, defendants' argument assumes its own premise. Congress would only need to use the word "employee" if "parties" didn't incorporate the previous reference to "employee."

Defendants next emphasize the "either party" language ("the disputes may be referred by either party"). 45 U.S.C. § 184. "Either," they say, means there are only two options for who can compel arbitration: the union or the carrier. [21] at 34. It is true that, in any one grievance dispute, there are only two options for who can compel arbitration (the winner or the loser). But it does not follow that the only two options for every grievance are the union versus the carrier. In fact, there are four possible

combinations: the employee and carrier, the employee and group of carriers, the union ("group of employees") and carrier, and the union and group of carriers.

The Supreme Court rejected defendants' "either party" argument in a Section 153 suit. *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 732–34 (1945). Section 153 regulates railroads and, unlike the other railroad provisions of the Act, has not been extended to regulate air carriers. *See* 45 U.S.C. § 184. But its language is nearly identical to that of Section 184. To wit, 45 U.S.C. § 153(i) (emphases added):

> The disputes between *an employee or group of employees and a carrier or carriers* growing out of grievances…shall be handled in the *usual manner* up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by *petition of the parties or by either party* to the appropriate division of the Adjustment Board.

In *Elgin*, the railroad made the same argument United makes here: that "either party" refers to the union or the carrier, but does not include the employee. *Elgin*, 325 U.S. at 732. The Court rejected that interpretation. *Elgin*, 325 U.S. at 733–34. It said, "[i]t would be difficult to believe that Congress intended…to submerge wholly the individual and minority interests, with all power to act concerning them, in the collective interest and agency, not only in forming the contracts which govern their employment relation, but also in giving effect to them and to all other incidents of that relation." *Elgin*, 325 U.S. at 733–34. The Court would only interpret the statute that way if Congress had provided the "clearest expression" that that was the statute's purpose and "if it were clear that no other construction would achieve the statutory aims"—neither of which was true. *See Elgin*, 325 U.S. at 734. The Court's

reading of Section 153's language, nearly identical to 184's, cannot be squared with defendants' argument about how to interpret "either party."

   2.   *Structure*

As noted above, the Act governs both the railway and air-carrier industries. Sections 151 to 165 relate to the railway industry. Sections 181 to 188 relate to air carriers. Section 181 provides that, with one exception, all of the provisions relating to the railway industry "are extended to and shall cover" the air-carrier industry. The exception is Section 153, which establishes the National Railroad Adjustment Board. That public board arbitrates minor disputes in the railway industry just as the privately established adjustment boards in the airline industry do.[7] The latter boards are established under the following provision of Section 184 (emphasis added):

> It shall be the duty of every carrier and of its employees, acting through their representatives…to establish a board of adjustment of jurisdiction *not exceeding the jurisdiction* which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of [45 U.S.C. § 153].

---

[7] Section 153 also allows railroads and their unions to establish their own arbitration boards in lieu of the National Railroad Adjustment Board. 45 U.S.C. § 153(x). These boards were the single and final arbitrators under the original version of the Act, passed in 1926. *Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 687–88 (1963) (citing Railway Labor Act, ch. 347, Tit. I, § 3, Pub. L. No. 257, 44 Stat. 578 (1926)). But under the 1934 amendments, unions and railway carriers were no longer required to establish these boards and could instead rely solely on the newly created National Railroad Adjustment Board. *See* Railway Labor Act, ch. 691, Pub. L. No. 442, 48 Stat. 1185 (1934). The NRAB became severely backlogged, and in 1966, Congress changed the adjustment-board structure to allow carriers or their employees (acting through their representatives) to require dispute resolution before a special board of adjustment. *See Merchants Despatch Transp. Corp. v. Sys. Fed'n No. One Ry. Emps.' Dep't AFL-CIO Carmen*, 551 F.2d 144, 147 (7th Cir. 1977). Defendants point to this history to highlight the absence of direct involvement by individual employees in organizing the boards and the congressional emphasis on collective bargaining to settle minor disputes in the industry. *See* [21] at 23–27. Individual employees do not set the composition of the board and no doubt Congress expected representative unions to filter individual grievances. But that context does not answer the question of whether an individual employee has a statutory right to petition for board-level arbitration. And in the railway industry, individual employees have that right under Section 153.

Defendants read this to mean that they can define the jurisdiction of the air-carrier adjustment board to anything narrower than the jurisdiction of the National Railroad Adjustment Board. [21] at 35–37. One way to restrict jurisdiction, they say, is to decide by collective-bargaining agreement that the adjustment board can hear only grievances brought by the union or carrier—not by an employee. [21] at 35–36.[8]

But the cases they cite in support of that argument are all about restricting a board's jurisdiction over certain substantive matters, not restricting something a statute expressly authorizes. [21] at 35–36 (citing *Careflite v. Office & Pro. Emps. Int'l Union, AFL-CIO*, 612 F.3d 314, 322–23 (5th Cir. 2010)) (prohibiting arbitration of grievances based on discharge for failure to obtain a license); *Air Line Pilots Ass'n, Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 92 (D.C. Cir. 1988) (arbitrability of disability-benefit claims); *Bonin v. Am. Airlines, Inc.*, 621 F.2d 635 (5th Cir. 1980) (arbitrability of pension-plan issues). Reading "jurisdiction" to allow unions and airlines to decide on the identity of petitioners would contradict Section 184's other language and the Court's reasoning in *Elgin*, so I decline to do so.

Defendants make one last comparison to Section 153. They note that Section 153 gives employees the right to be heard in person and requires adjustment boards to notify them of a hearing. [21] at 36 (citing 45 U.S.C. § 153, First (j)). Section 184

---

[8] Whether the collective-bargaining agreement limits the adjustment board to hearing disputes brought only by the union or carrier is a question that is likely outside a federal court's jurisdiction because it requires interpretation of the agreement. But I note that Section 18-C-2 of the collective-bargaining agreement says the board shall hear disputes properly submitted by the union or carrier, but does not expressly forbid the board from hearing disputes brought to it by individual employees. [18-4] at 196.

does neither. If Congress wanted employees to have an individual right to arbitrate, it would have included similar provisions in Section 184, they say. [21] at 36. I disagree. Congress gave employees that right by (essentially) copying and pasting other language from Section 153. *See Elgin*, 325 U.S. at 732–34. There was no need for a belt-and-suspenders approach.

### 3. Statutory Purpose and Circuit-Court Split

Circuit courts disagree about whether Section 184 gives individual employees the right to compel arbitration. The Third and Sixth Circuits say it does. *See Capraro v. UPS Co.*, 993 F.2d 328, 336 (3d Cir. 1993); *Miklavic v. USAir, Inc.*, 21 F.3d 551, 555 (3d Cir. 1994); *Kaschak v. Consol. Rail Corp.*, 707 F.2d 902, 909–10 (6th Cir. 1983). The Fifth and Eighth Circuits say it doesn't, *see Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d 225, 232–33 (5th Cir. 2007); *Martin v. Am. Airlines, Inc.*, 390 F.3d 601, 608–09 (8th Cir. 2004), and the First Circuit has expressed skepticism, *see Bryan v. Am. Airlines*, 988 F.3d 68, 76 (1st Cir. 2021).

These disagreements mostly stem from differing ideas about the statute's purpose. The Third and Sixth Circuits say the Act reflects strong congressional interest in two objectives: that minor disputes be arbitrated, not litigated; and that "employees…not [be] left remediless and without a forum to present their grievances." *Capraro*, 993 F.2d at 336 (citation and quotations omitted). Limiting an employee's right to arbitration via the collective-bargaining agreement may be equivalent to leaving him remediless, and "grant[ing] him or her no individual right at all." *Kaschak*, 707 F.2d at 909.

16

Employees are not left remediless if they have no individual right to compel arbitration. They are still entitled to bring so-called hybrid claims before the courts. Those claims comprise a claim against the union for violating its duty of fair representation and a claim against the employer for breaching the collective-bargaining agreement's terms. *See, e.g.*, *Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 804 (7th Cir. 2008). No doubt, plaintiffs face an uphill battle in bringing these claims. *See Vaca v. Sipes*, 386 U.S. 171, 190 (1967) (breach occurs only when union's conduct is "arbitrary, discriminatory, or in bad faith"); *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013). But they still offer some remedy.

I do, however, agree with the Third Circuit's point that leaving employees with hybrid claims as their only remedy can't be squared with Congress's interest in keeping minor disputes out of the courts. *Capraro*, 993 F.2d at 336. Reading Section 184 as giving only the union and employer the right to compel arbitration would directly undermine that interest by forcing employees who would otherwise seek arbitration to instead bring a hybrid claim in court. It would also ignore the fact that the "RLA contemplates the presence of three entities: the employer, the individual employee[,] and the union" and that "[t]he rights of the individual employee as against the employer are not coextensive with those of the union." *Kaschak*, 707 F.2d at 909–10.

The Fifth Circuit implicitly acknowledges this point. But, it says, effectuating the federal labor statutes "require[s] that the interests of particular individuals be subordinated to the interests of the group." *Mitchell*, 481 F.3d at 232. If an employee

17

could compel arbitration without the union's approval, it would "destroy[] the employer's confidence in the union's authority and return[] the individual grievant to the vagaries of independent and unsystematic negotiation." *Mitchell*, 481 F.3d at 232–33 (quoting *Vaca*, 386 U.S. at 190); *see also Elgin*, 325 U.S. at 758 (Frankfurter, J., dissenting) ("[T]o permit any member of the union to pursue his own interest under a collective agreement undermines the very conception of a collective agreement. It reintroduces the destructive individualism in the relations between the railroads and their workers which it was the very purpose of the Railway Labor Act to eliminate.").

The Supreme Court made this point in *Vaca v. Sipes*, holding that under the Labor Management Relations Act, an individual employee doesn't have an absolute right to take his grievance to arbitration. 386 U.S. at 191. The union should be able to prevent frivolous grievances from proceeding, the Court said. If it were not able to, the "grievance machinery" prescribed by the collective-bargaining agreement would be so overburdened that it would stop functioning successfully. *Id.* at 192. And in that case, the union and employer might decide to no longer offer the kind of detailed grievance and arbitration procedures encouraged by the LMRA. *Id.*

If *Vaca* were the Court's only word on the issue, the Fifth Circuit's opinion might be persuasive. But in *Elgin*, the Court took a different approach to Section 153 of the Railway Labor Act, which tracks the language in Section 184. *See Elgin*, 325 U.S. at 733–34. There, the Court said that without a clear statement from Congress, it would not give the union exclusive authority to effectuate the provisions of the

collective-bargaining agreement. *Id.* Because *Elgin* concerned the same statute—not to mention nearly the same words—I find it more persuasive here.

Finally, defendants point to the Eighth Circuit's opinion in *Martin v. American Airlines, Inc.*, 390 F.3d 601 (8th Cir. 2004). [21] at 37. There, the court said that although Section 153 gives *railroad* employees the individual right to arbitrate, Section 153 does not apply to air carriers. *Id.* at 608–09. Therefore, air-carrier employees lack the individual right to arbitrate. *Id.* at 609. But as Judge Feinerman noted in *Santiago v. United Air Lines, Inc.*, 969 F. Supp. 2d 955, 967 (N.D. Ill. 2013), *Martin* never mentions Section 184, which does apply to air-carrier employees and for the reasons discussed, allows individual employees to commence arbitration. *Martin* is not persuasive.

### 4. Individual Employees' Rights to Vacate Arbitration Awards

Defendants emphasize a separate instance of individual airline employees lacking a right that their railway counterparts have: the right to seek vacatur of arbitration awards. [21] at 34–35. It wouldn't be anomalous, then, for airline employees to lack the right to compel arbitration, even as their railroad counterparts have that right. [21] at 34–35. Defendants cite to decisions from this circuit and the Fifth Circuit as evidence that individual air-carrier employees lack the right to seek vacatur. [21] at 35 (citing *Anderson v. Norfolk & W. Ry.*, 773 F.2d 880, 882 (7th Cir. 1985); *Mitchell*, 481 F.3d at 232–33; and *Horner v. Am. Airlines, Inc.*, 927 F.3d 340, 342 (5th Cir. 2019)). In fact, this circuit hasn't weighed in on the issue. *Anderson* involved the post-merger negotiation of a new collective-bargaining agreement. 773 F.2d at 880–81. The negotiation was mandated by the Interstate Commerce Act, 49

19

U.S.C. § 11347; the Railway Labor Act played no role in the case. *Id.* at 880. After the arbitrator approved the agreement, employees challenged it in court. *Id.* at 881. The court said the plaintiffs lacked standing because they were not parties to the original arbitration proceeding. *Id.* at 882. *Anderson* is inapposite. It involved the creation of a collective-bargaining agreement (which involves only the union and the employer), not vindication of an employee's rights in a preexisting agreement, and it didn't concern the RLA. Defendants are right, though, that in the Fifth Circuit, an individual grievant generally lacks standing to seek vacatur when the union has exclusive authority to compel arbitration in the first place. *Mitchell*, 481 F.3d at 232–33; *Horner*, 927 F.3d at 342.

Other courts have come out differently on the issue. As plaintiff notes, two other circuits have said that individual airline employees are entitled to seek vacatur of arbitration awards and a third has simply allowed an employee to do so (without discussing the issue). *See* [25] at 30 (citing *McQuestion v. N.J. Transit Rail Operations*, 892 F.2d 352, 354 (3d Cir. 1990); *Fine v. CSX Transp., Inc.*, 229 F.3d 1151, 2000 WL 1206526, at *3 (6th Cir. 2000) (unpublished); *Parsons v. Cont'l Airlines, Inc.*, 215 Fed. App'x 799, 800–01 (11th Cir. 2007)). So it's not settled that an employee is without post-arbitration remedies, and the availability of post-arbitration remedies is, in any event, not a reason to depart from the text of Section 184 and its grant of authority to compel arbitration.

Individual employees have a statutory right to compel arbitration. The union cannot act as a "gatekeeper," [25] at 11, and prevent plaintiff from invoking his

statutory right to arbitration. But whether the union can require plaintiff to exhaust the grievance-hearing process is a separate issue.

### C.    Exhaustion and Futility

####    1.    *Exhaustion and "In the Usual Manner"*

Under the Act, an employee must exhaust a collective-bargaining agreement's administrative process before heading to arbitration. This exhaustion requirement comes from the statutory provision that "disputes between an employee or group of employees and a carrier or carriers growing out of grievances…be handled *in the usual manner*" before beginning arbitration. 45 U.S.C. § 153, First (i); § 184 (emphasis added); *see Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 73–74 (2009); *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 707 F.3d 791, 793 (7th Cir. 2013); *Ryan v. Union Pac. R.R. Co.*, 286 F.3d 456, 458–59 (7th Cir. 2002) ("usual manner" means manner in which grievance proceedings are supposed to be conducted under the provisions of the collective-bargaining agreement). Exhaustion is not required, though, when it would be futile, *Glover v. St. Louis-S.F. Ry. Co.*, 393 U.S. 324, 330 (1969)—if, for instance, the people adjudicating an employee's grievances are the very people who violated his rights, *D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1488 (7th Cir. 1985), or if the grievance process is, in reality, either "unavailable or ineffective." *Bhd. of Ry., Airline & Steamship Clerks v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 411 (7th Cir. 1988).

Defendants make two distinct arguments about Bumpus's pursuit of his grievance. First, they say that plaintiff hasn't gone through the last required

administrative remedy: a hearing before the Grievance Review Panel. [21] at 21. Second, they say that the "usual manner" of handling grievances is filing them in a timely manner. [21] at 29. Here, that means filing within 180 days of when plaintiff "reasonably would have had knowledge of the facts upon which the grievance is based," which defendants say plaintiff didn't do. [26] ¶ 5 (citing [18-4] at 187).

Plaintiff counters that requiring him to go through the Grievance Review Panel violates his individual right to arbitration; he cannot be required to exhaust a process that Section 184 doesn't allow for in the first place. [25] at 11–12. But requiring an employee to go through a grievance hearing doesn't necessarily preclude a Section 184 petition to compel arbitration; it's just one step that unions and carriers may bargain for as part of the usual manner of handling grievances. Here, the union and United agreed to make employees present their case to the review panel before going to the arbitration board. [18-4] at 187–88. Going through the review-panel stage is therefore part of the "usual manner" of handling grievances, and Bumpus has yet to go through that step. If Bumpus loses, he will still be free to pursue arbitration (assuming he fulfills all other "usual manner" preconditions). Because I find that plaintiff didn't exhaust by going through the Grievance Review Panel, I don't reach defendants' untimeliness argument.

### 2. *Futility*

Plaintiff says exhaustion in his case would have been futile for two reasons. [25] at 16–17. First, the statute of limitations on his claim to compel arbitration was going to run out before the union scheduled its next Grievance Review Panel hearing. [25] at 20. Second, the union and United had already clearly stated their opposition

to his grievance, so it was a foregone conclusion that the panel would deny the grievance. [25] at 16–17.

### a.  Statute of Limitations and Accrual

Plaintiff first brought up his concern about the statute of limitations in an email to a union lawyer in late September 2021. [18-15] at 2. He cited a decision from the Second Circuit, which held that a plaintiff has six months from the time a party "unequivocally refuses a demand to arbitrate" to move to compel arbitration. [18-15] at 2 (citing *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 581 (2d Cir. 2019)). Plaintiff said his arbitration claim accrued on July 20, 2021, so he had until January 20, 2022, to move to compel arbitration. [18-15] at 2. Working backward from that date—accounting for the time he would need to prepare a motion, the time the review panel would take to issue a decision, and the thirty-day notice he was entitled to before the review hearing—he calculated that he would need a hearing no later than November 10, 2021. [18-15] at 2. Defendants declined to commit to that date. They told plaintiff that the panel would likely meet in early spring or late winter of 2022. [18-15] at 3. They also said they didn't understand why plaintiff's claim would have accrued in July 2021 if the claim couldn't accrue until he'd exhausted his administrative remedies. [18-15] at 3. As defendants note, in duty-of-fair-representation cases brought under the Act, the statute of limitations is tolled while an employee pursues internal union remedies. *See Frandsen v. Bhd. of Ry., Airline & S.S. Clerks*, 782 F.2d 674, 684 (7th Cir. 1986); *Pantoja v. Holland Motor Exp., Inc.*, 965 F.2d 323, 327–28 (7th Cir. 1992).

Those cases are irrelevant in plaintiff's view because, unlike in duty-of-fair-representation cases, he is not seeking the union's representation at arbitration. [25] at 19. This distinction is immaterial. The *Frandsen* court wrestled with the same issue presented here: how to harmonize an intra-union remedy exhaustion requirement with a statute of limitations that could run out before a grievance was exhausted. *Pantoja*, 965 F.2d at 327–28 (summarizing *Frandsen*, 782 F.2d at 684). The solution was tolling—a fix that makes just as much sense for RLA claims as it does for LMRA claims.

Plaintiff makes one additional argument on this front. He says that even if the statute of limitations was tolled on his claim against the union, it wasn't tolled on his claim against the carrier. [25] at 20. This ignores the reasoning of *Frandsen*. There, the court said that a plaintiff doesn't have to "pursue his grievance against the [carrier] in order to toll the statute of limitations against both the union and the [carrier] during his pursuit of intra-union remedies." *Frandsen*, 782 F.2d at 684. Granted, *Frandsen* was a duty-of-fair representation suit. But its reasoning is as applicable here: federal labor statutes generally prioritize exhaustion of internal, nonjudicial processes over judicial resolution. *Id.* (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151 (1983) and *Clayton v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers*, 451 U.S. 679 (1981)). It makes sense, then, to actually give employees the time to pursue those remedies before the clock starts to tick.

What's more, plaintiff's claim to compel arbitration hadn't yet accrued when he was negotiating dates for a hearing. The claim accrues when the union makes a

24

"final decision" about the grievance or when, in the exercise of reasonable diligence, the plaintiff should have discovered that the union would take no further action on his grievance. *Konen v. Int'l Bhd. of Teamsters*, 255 F.3d 402, 406 (7th Cir. 2001). So a claim may begin accruing when the union unequivocally states that it won't be taking a grievance to arbitration. *See Dozier v. Trans World Airlines, Inc.*, 760 F.2d 849, 851 (7th Cir. 1985). But here, the union lawyer told Bumpus that, although the union had decided not to submit his grievance to the arbitration board, Bumpus was free to appeal that denial. [23] ¶ 54. In other words, the union's decision not to arbitrate would change if plaintiff prevailed at the grievance review hearing—it was tentative, not final. Only the Grievance Review Panel had the authority to make a final decision and trigger accrual. Plaintiff's claim still has not accrued.

### b. Bias

Plaintiff's next futility argument is that exhaustion would have been pointless because the panel would inevitably have rejected his grievance. [25] at 16–17. The union expressed "implacable opposition" to plaintiff's attempt to arbitrate and showed "unremitting and documented hostility" to plaintiff's underlying seniority grievance. [25] at 16–17. Speculation that a grievance process is futile generally doesn't excuse a failure to exhaust the process. *See Douglas v. Am. Info. Tech. Corp.*, 877 F.2d 565, 574 (7th Cir. 1989); *Perry v. Midstates Indep. Union & Krooswyk Trucking & Excavating*, 20 Fed. App'x 527, 531 (7th Cir. 2001). Plaintiff's citation to *Glover v. Saint Louis-San Francisco Railway, Co.*, 393 U.S. 324, 330 (1969), is not on point. [25] at 16. *Glover* involved racial discrimination by both union and company officials who were working together to prevent Black employees from being promoted.

393 U.S. at 325. When Black employees tried to begin the grievance process, the union simply refused to process their grievances. So, too, with white employees who complained of discrimination against their fellow workers. *Id.* at 326–27. That is not the case here. The union was willing to hear plaintiff's grievance at the final pre-arbitration stage, and in fact emailed him an exact date for his hearing. [29] ¶¶ 2–3. The hearing didn't proceed because plaintiff, not defendants, didn't respond to the email. [29] ¶¶ 3–4. Plaintiff might have good reason to think he won't prevail in front of the panel. But that belief isn't enough; he must at least try it out.

Finally, plaintiff argues that he is entitled to a single, neutral arbitrator, instead of the usual five arbitrators (two appointed by the carrier, two by the union, and one neutral). [18-1] at 13–15; [25] at 35–36. Because I find that plaintiff has not exhausted the grievance process, I don't reach this issue, although as I note above, individual employees do not determine the composition of adjustment boards.

## IV. Conclusion

Plaintiff's motion for summary judgment, [18], is denied. Defendants' cross-motion for summary judgment, [20], and motion to supplement, [29], are granted. The clerk shall enter judgment in favor of defendants, without prejudice to plaintiff filing suit after exhausting administrative remedies.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:   June 10, 2022